# CASES AT LAW

DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY.

NOVEMBER TERM, 1908.

---

THE STATE OF NEW JERSEY, PLAINTIFF IN ERROR, v. ATLANTIC CITY AND SHORE RAILROAD COMPANY, DEFENDANT IN ERROR.

Argued December 2, 1908—Decided March 1, 1909.

1. Under the General Railroad act (*Pamph. L.* 1903, *p.* 647, § 3) a railroad company may exercise the general powers conferred by the Corporation act of 1896 only so far as the same are appropriate to and not inconsistent with the Railroad act or with the provisions of the act under which such company may have been created and organized. Under this section a railroad company may not claim any general power that is not appropriate to and consistent with the construction, maintenance and operation of its railroad between the *termini* declared by it pursuant to the Railroad act.

2. The power to purchase, hold, &c., stock and bonds of other corporations conferred by section 51 of the General Corporation act (*Pamph. L.* 1896, *p.* 294) is to be exercised subject to the limitations imposed by section 2 of the same act (*Pamph. L.* 1896, *p.* 278), that is to say, the power exists as a primary power only when the purpose to exercise it as such is expressed in the certificate of incorporation, and otherwise it exists as an incidental power only so far as necessary or convenient to the attainment of

the objects that are set forth in the charter or certificate of incorporation.

3. Corporations possess only such powers as are specifically granted by the state and such incidental powers as are necessary for carrying these into effect. Hence arises the rule, generally obtaining in this country, that one corporation cannot become a stockholder in another unless authority is clearly granted by statute.

4. *Warren* v. *Pim*, 21 *Dick. Ch. Rep.* 353, distinguished.

5. A railroad company incorporated under *Pamph. L.* 1903, p. 645, for the purpose of constructing, maintaining and operating a line of railway with definite *termini—Held*, to be without power to hold the stock and bonds of a street railway company operating beyond those *termini*, and thereby to control the operations of the street railway.

6. A railroad company organized under *Pamph. L.* 1903, p. 645, having by an usurpation of franchises acquired ownership of all the bonds and of substantially all the stock of a street railway company organized under *Pamph. L.* 1886, p. 185 (*Gen. Stat., p.* 3216), and having thus practically absorbed the street railway company into itself—*Held*, that the exercise by the railroad company of the control resulting from such ownership, including the operation of its cars over the street railway lines, and the making of an agreement ostensibly between the two companies for the continuance of such operation, likewise constitute an usurpation of franchises by the railroad company.

7. The form of judgment in *quo warranto* in such a case discussed.

---

On error to Supreme Court, whose opinion is reported in 47 *Vroom* 15.

For the plaintiff in error, *Robert H. McCarter*, attorney-general, and *Eli H. Chandler*.

For the defendant in error, *Clarence L. Cole*.

The opinion of the court was delivered by

PITNEY, CHANCELLOR.    To an information in the nature of a *quo warranto* filed by the attorney-general *ex officio*, in behalf of the state against the Atlantic City and Shore Railroad Company and the Central Passenger Railway Company, setting up certain alleged usurpations of corporate powers not granted by the state, the companies filed separate pleas.    To the plea of the Atlantic City and Shore Railroad Company, the attorney-general interposed a demurrer, and upon the

issue of law thus raised the Supreme Court gave judgment in favor of the defendant. That judgment is now under review. So far as we are informed by the record returned to us, issue has not been joined upon the plea of the Central Passenger Railway Company, and we have no present concern with the matters set up by that company.

The averments of the information as against the Atlantic City and Shore Railroad Company are in part admitted and in part qualified or denied by the averments contained in its plea. Since the demurrer admits what is well alleged in the plea, we must accept the averments of the latter so far as they are variant from the information.

The case thus disclosed stands as follows:

The Shore company (as it may be called for brevity) is a corporation organized and existing under the revised "Act concerning railroads" (*Pamph. L.* 1903, *p.* 645), and under its charter and according to its route filed in the office of the secretary of state is authorized to build a line of railway from a point on the meadows in the township of Egg Harbor, in the county of Atlantic, to a point at the corner of Virginia and Adriatic avenues in Atlantic City, in the same county, and had been operating its railroad for about six months prior to the filing of the information.

This company has acquired all of the bonds (amounting to $40,000) and all of the stock of the Central Passenger Railway Company, excepting a few qualifying shares of stock necessary to preserve the organization of the latter company; the amount of stock thus acquired being two thousand four hundred and ninety-one shares. Before the filing of the information the Shore company had verbally entered into a certain agreement with the Central company, and since the filing of the information this agreement has been reduced to writing. A copy thereof is annexed to and made a part of the plea of the Shore company. Its purport will be stated presently.

The Central Passenger Railway Company is a corporation organized and existing under the "Act to provide for the incorporation of street railway companies and to regulate the same" (*Pamph. L.* 1886, *p.* 185; *Gen. Stat., p.* 3216), and

the various acts amendatory thereof and supplemental thereto. Under its charter and according to its amended route filed in the office of the secretary of state, it has secured from the city of Atlantic City ordinances enabling it to construct certain lines of street railway in Atlantic City, and is empowered to operate and does operate certain of the lines thus authorized. The lines in operation extend from a point at Virginia avenue and the boardwalk northwardly along Virginia avenue to Adriatic avenue, thence westwardly along Adriatic avenue to South Carolina avenue, and thence southwardly along South Carolina avenue to the boardwalk.

The tracks of the Shore company and of the Central company meet at Virginia and Adriatic avenues, and the Shore company has formed a junction between the tracks of the two companies at that point.

The Shore company claims to have entered into a contract for itself and on behalf of the Central company with the West Jersey and Seashore Railroad Company whereby the Shore company has secured a lease upon the Somers Point branch of the latter company extending from Pleasantville to Somers Point in Atlantic county, and has further acquired traffic rights over the tracks of the West Jersey company, and the Shore company has agreed to exchange traffic and sell exchange tickets good on all intersecting lines of the West Jersey and Seashore Railroad Company with the line of the Shore company and of the Central company, and has agreed that the West Jersey and Seashore Railroad Company shall have the right to operate its cars over the line of the Shore company and the Central company to the terminal points of the latter two companies.

The information avers that the Shore company is operating its cars over the lines of the Central company from the terminal point of the latter company at the foot of Virginia avenue over and along the lines of the Central company on Virginia avenue, and over and along the line of the Shore company, to the intersection between the railroad of that company and the line of the West Jersey and Seashore Railroad Company. The Shore company by its plea denies that it is operating its

cars over the line of the Central company or any portion thereof, or that the Central company is operating its cars over the line of the Shore company or any portion thereof, and avers that the Shore company operates only its own road and its own cars.

The agreement between the Shore company and the Central company which is embodied in the plea, after reciting that the Shore company operates a railroad from Somers Point to Virginia and Adriatic avenues in Atlantic City, and that the Central company operates a street passenger railway in that city along Virginia, Adriatic and South Carolina avenues as already mentioned, and that the tracks of the two companies meet at Virginia and Adriatic avenues, contains stipulations to the effect that upon the arrival at Virginia and Adriatic avenues of each of the cars of the Shore company running from Somers Point or from any intermediate point, the Shore company may deliver possession of such car to the Central company, and the latter company will operate the same as a street railway car upon its lines in Atlantic City, either to Virginia avenue and the boardwalk, or to South Carolina avenue and the boardwalk; that through passengers shall become the passengers of the Central company and be transported by it as required by law; that the cars upon reaching the terminus of the Central company's line either at Virginia avenue and the boardwalk or at South Carolina avenue and the boardwalk, will be operated by the Central company over its lines from such terminus to Virginia and Adriatic avenues, and there be delivered over to the Shore company, which shall thereupon operate them as railroad cars over its lines to Somers Point or to some other intermediate point. The agreement contains stipulations for the sale of through tickets at rates to be agreed upon from time to time by the two companies, and provides for the apportionment between the two companies of the passenger fares to be thus received. It contains certain other provisions not necessary to be recited.

The information challenges the right of the Shore company under its act of incorporation to acquire, own and hold the stock and bonds of the Central company, or to operate its cars

over the lines of the latter company; charges that the acts and doings of the Shore company in securing the franchise, rights and privileges of the Central company and the operation of its cars and motive power over the lines of that company and the acquisition and use of these lines to form an extension or continuous line of railroad under the ownership and control of the Shore company is an attempted fraud upon the people of the state, sought to be committed under color of assumed franchise privileges that have not been granted to the Shore company and are not included among the rights conferred upon railway companies incorporated under the act of 1903; and that the operation of the cars of the Shore company over the line of the Central company is a fraud upon the state and a violation of the franchise privileges granted to the Shore company and the Central company under their respective articles of incorporation.

The information prays that the companies may answer to the state by what warrant they severally claim the right to make an agreement for the consolidation and merger of their respective lines with each other and with the West Jersey and Seashore Railroad Company in law or effect, and by what warrant they claim the right to operate the cars of the Shore company over the lines of the Central company.

The matters discussed in argument are—*first,* the right of the Atlantic City and Shore Railroad Company to acquire, own and hold the stock and bonds of the street railway company; *secondly,* its right to operate its cars and motive power over the street railway; and *thirdly,* its right to enter into an agreement with the street railway company for the purpose of enabling the Shore company to secure a right of way for the operation of its motive power, cars and other equipment through Atlantic City under the franchise privileges granted to the street railway company.

Upon the first topic, the Supreme Court entertained the view that irrespective of the powers conferred upon railroad companies by section 3 of the revised act concerning railroads (*Pamph. L.* 1903, *p.* 647), the legislature, by the fifty-first section of the General Corporation act (*Pamph. L.* 1896, *p.*

294), has conferred upon every corporation of this state, no matter under what law it may have been organized, the right to acquire and hold the stock and bonds of any other corporation of this or any other state; and that the statute puts no limitation upon the quantity of stock or bonds that may be acquired, so long as one corporation does not acquire all of the stock of another and thus destroy its organization and power to exercise its franchise. It was therefore held that the act of the Shore company in purchasing and holding a controlling interest in the stock of the Central company was within the power conferred upon the Shore company by the legislature.

Section 51 of the General Corporation act (*Pamph. L.* 1896, *p.* 294) reads as follows:

"Any corporation may purchase, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of the shares of the capital stock of, or any bonds, securities or evidences of indebtedness created by any other corporation or corporations of this or any other state, and while owner of such stock may exercise all the rights, powers and privileges of ownership, including the right to vote thereon."

Reading this section alone, and treating it as unqualified by other legislation, it no doubt conveys the very broad import that is attributed to it in the opinion of the Supreme Court. And the circumstance, pointed out in the opinion, that in the year 1893 the legislature by a supplement to the General Corporation act of 1875 (*Pamph. L.* 1893, *p.* 301; *Gen. Stat., p.* 963, *pl.* 260) authorized corporations *created under the act of 1875* to purchase, hold, &c., shares of the capital stock of any other corporation created under the laws of this or any other state; and that in the revision of 1896 the express limitation of this authority to companies organized under the General Corporation act was omitted, is no doubt an added reason, beyond the mere language of the present section 51, for giving a somewhat extensive signification to that language.

Nevertheless, upon mature reflection, it seems to us that section 51, when read (as it must be) in the light of what is elsewhere contained in the act of which it is a part, and of the

general policy of our corporation laws manifested in numerous other statutes, including the General Railroad act of 1903, is very much more limited in its effect.

Before proceeding to give our reasons, we deem it proper to say that the question is not concluded by the decision of this court in *Warren* v. *Pim*, 21 *Dick. Ch. Rep.* 353. In the first place, while in that case a majority of this court held that the voting trust under consideration was contrary to public policy, inoperative, null and void, and while the entire court approved of a decree that set aside the trust with respect to the shares of which certain of the complainants were the equitable owners, yet the differences of opinion in this court with respect to the grounds of the relief thus granted were such that none of the reported opinions expressed the view of a majority of the court upon any legal proposition involved in the case. Secondly, the question at issue in that case was the validity as against the complainants of a voting trust that had been attempted to be established by a majority in interest of the stockholders of the Fisheries company (a corporation of this state). The complainants, some of whom had purchased shares that were claimed to have been subjected to the trust, denied that their predecessors in title had in fact assented to become bound by its terms; they further asserted that the voting trust agreement, even if assented to in fact, was void in law as being contrary to the letter and policy of the General Corporation act of this state, under which the Fisheries company was incorporated. The agreement provided that the nominal ownership of the "trusteed" stock, with the voting power, should be vested in a British corporation known as the "Association of Foreign Shareholders of the Fisheries Company of New Jersey, Limited." Some of the judges deemed that the legal validity of that agreement depended upon the question whether our General Corporation act permitted a British corporation such as the "association" to hold stock in one of our corporations. It was not a question whether the British corporation was acting within the powers conferred upon it by Great Britain in assuming to exercise such ownership. Under its articles of association it clearly had this

liberty. The question was whether New Jersey by its legislation had permitted the stock of a New Jersey company to be held and voted on by such a foreign corporation. Mr. Justice Dixon, in opening the discussion, alluded to the doctrine that one corporation cannot become a stockholder in another corporation unless authority therefor is clearly granted by statute, and at once proceeded to say (21 *Dick. Ch. Rep.* 359, at top) : "This doctrine presents two aspects; it brings into view both the law, conferring power upon the corporation claiming to own the stock, and also the law subjecting the stock to ownership. *The latter aspect is that now chiefly to be regarded."* The discussion to which we are now referred bears upon this limited topic, as appears from what was said by Justice Dixon, 21 *Dick. Ch. Rep.* 359, &c.; by Justice Garrison, *p.* 362, &c.; by the present writer, *p.* 364, 365, &c.; and by Justice Swayze, *p.* 413, &c.

The present case, which involves the liberty or capacity of a certain New Jersey corporation to hold stock in another company, presents a very different question; the question whether in holding such stock it exceeds the powers conferred upon it, expressly or impliedly, by the legislature.

Manifestly, we should first refer to the act under which the railroad company was incorporated. Had this been a special act of legislation it would naturally have contained within itself not only a grant of powers but a limitation, express or implied, upon such grant. But since the constitutional amendments of 1875 forbidding the legislature thereafter to pass special laws granting the right to lay down railroad tracks, or any special act conferring corporate powers, and requiring that general laws be passed under which corporations may be organized and corporate powers of every nature obtained (*N. J. Const.,* art. 4, § 7, *pl.* 11), the grant of corporate powers is now to be sought in the general laws thus enacted and in the articles of association filed thereunder, which are in effect the "charter" of the company.

The revised "Act concerning railroads" (*Pamph. L.* 1903, *p.* 645), in its first section requires, as the first act to be done by those who assume corporate powers thereunder, that a certifi-

cate of incorporation shall be executed, proved or acknowledged as required for deeds of real estate, and filed in the office of the secretary of state, which shall set forth sundry matters requisite for a proper definition and limitation of the powers of the corporation; amongst other things, "the object of the company, the terminal points of the proposed railroad, the counties of this state in or through which it and its branches are intended to be constructed, and the length of such road and each of its branches, as near as may be."

Section 3 of the same act declares that every railroad company shall have the general powers conferred by the Corporation act of 1896 and the supplements thereto, and shall be governed by the provisions and be subject to the restrictions and liabilities in said act contained, *"so far as the same are appropriate to and not inconsistent with this act or with the provisions of the act under which any such company may have been created and organized,"* and in addition thereto shall have power to locate and determine its route and works, to acquire from time to time and hold and use all such real estate and other property as may in the judgment of its directors be necessary for terminal purposes and for the construction and maintenance of its railroad, and stations, branches, sidings, car yards, engine houses, repair shops, and other accommodations necessary to accomplish the objects of its incorporation, and to construct and operate its road, to charge and collect fares, &c., and to exercise all other powers by this act granted. Section 7 provides that when the route of the railroad shall have been determined upon, a survey of such route and location, particularly describing the same, shall be filed in the office of the secretary of state. Subsequent sections provide for the construction of the proposed railroad and for its maintenance, operation and regulation.

Concerning the Atlantic City and Shore Railroad Company, the record before us discloses that under its charter and according to its route filed in the office of the secretary of state it is authorized to build and has built a line of railway from a point in Egg Harbor township to a point at the corner of Virginia and Adriatic avenues in Atlantic City. These points,

therefore, are the *termini* adopted by the company and publicly manifested in the mode prescribed by the Railroad act. It is plain, we think, that this company is by its articles of association and the provisions of the Railroad act excluded from building or operating a railroad beyond the *termini* thus specified, either by direct means or by the indirect method of stock ownership in another company, unless, indeed, such power is to be derived from section 3 of the Railroad act, which confers upon every railroad company certain general powers conferred by the Corporation act of 1896 and the supplements thereto. But this grant is expressly limited so as to have effect only so far as said powers are "appropriate to and not ·inconsistent with this act or with the provisions of the act under which any such company may have been created and organized."

The proper construction of this enactment, as we think, is, that since the Railroad act prescribes definite *termini* for the railroads authorized to be constructed thereunder, and requires these to be stated in the articles of association, powers that are not appropriate to and consistent with the construction, maintenance and operation of a railroad between such *termini* may not be claimed by the railroad company under the section referred to.

Moreover, the grant of general powers contained in that section is confined to such as are conferred by the Corporation act of 1896. *Pamph. L.* 1896, *p.* 277. If this act contains in itself any limitation upon the grant of the stockholding power set forth in its fifty-first section, this limitation is of course operative upon railroad companies assuming the power to hold stock in other corporations.

Turning, therefore, to the act of 1896, we find its first section sets forth certain powers that every corporation shall have, viz., to have succession for the period limited in its charter or certificate of incorporation, and when no period is limited then perpetually; to sue and be sued; to make and use a common seal; to hold, purchase and convey such real and personal estate as the purposes of the corporation shall require; to appoint officers and agents such as the business

of the corporation shall require; to make by-laws; to wind up and dissolve itself or be wound up and dissolved.

Section 2 reads as follows: "In addition to the powers enumerated in the first section of this act, and the powers specified in its charter or in the act or certificate under which it was incorporated, every corporation, its officers, directors and stockholders, shall possess and exercise all the powers and privileges contained in this act *so far as the same are necessary or convenient to the attainment of the objects set forth in such charter or certificate of incorporation,* and shall be governed by the provisions and be subject to all the restrictions and liabilities in this act contained so far as the same are appropriate to and not inconsistent with such charter or the act under which such corporation was formed; *and no corporation shall possess or exercise any other corporate powers except such incidental powers as shall be necessary to the exercise of the powers so given."*

In the former General Corporation act, approved April 7th, 1875 (*Gen. Stat., p.* 907, &c.), section 3 was as follows: "That in addition to the powers enumerated in the first section of this act and to those expressly given in its charter or in the act or certificate under which it is or shall be incorporated, no corporation shall possess or exercise any corporate powers except such as shall be necessary to the exercise of the powers so enumerated and given."

A similar provision contained in the Corporation act of 1846 was referred to by this court in *Morris and Essex Railroad Co.* v. *Sussex Railroad Co.,* 5 *C. E. Gr.* 542, 562, where it was pointed out that the common law rule limits corporations to such powers as are given by the charter or necessarily implied for carrying into effect the objects and powers expressly sanctioned.

In the act of 1896, it will be observed that section 2 combines with the prohibition of corporate powers other than such as are incidental and necessary to the exercise of the granted powers, a liberty to exercise all the powers and privileges contained in this act (only) "so far as the same are necessary or convenient to the attainment of the objects set forth in such

charter or certificate of incorporation." But this language itself imports a grant merely incidental to the declared objects of the company.

Among the powers and privileges referred to are those mentioned in section 51 of the same act with respect to purchasing and holding shares of the stock and bonds and other evidences of indebtedness of other corporations. We deem it clear that section 51 is to be construed in subordination to section 2, and that the state thereby grants to one corporation the capacity to hold stock in another corporation only so far as such stock ownership is necessary or convenient to the attainment of the objects set forth in the charter or certificate of incorporation of the holding company.

Not only does this construction result, as we think, from the letter of the law, but it seems to us that to read section 51 as unqualified by anything *ab extra* would contravene the general policy of our corporation laws.

Our Corporation act and Railroad act are not exceptional in requiring that the objects of the proposed company shall be stated in the certificate of incorporation, and that this certificate shall be made a matter of public record. Numerous other acts providing for the incorporation of different kinds of companies contain similar provisions. The legislative purpose is to preserve, for the benefit of the people and of private parties concerned, solemn evidence of the corporate powers that have been granted, of the contract made between the state and the corporations, and of the contract made by the corporators *inter sese*. It is only by reference to the certificates of incorporation that the attorney-general and other officials interested in behalf of the state can readily determine what powers have been granted and what have not been granted, and whether the company is usurping franchises not granted by the state. It is by reference to the articles of association that investors can conveniently ascertain the character of the contract into which they are entering and the property rights they are acquiring by purchasing stock of the company. And while the present proceeding raises no question of the rights of dissenting stockholders, the interests of stockholders and investors are not

to be laid aside when we are inquiring what construction is to be placed upon the statutory provisions in question.

It will be seen upon a little reflection that if the language of section 51 of the General Corporation act had unlimited scope, the articles of association would afford the least possible indication of the real objects of the company, and no evidence whatever of any limitation upon the powers that might in fact be exercised. Indeed, there would be practically no limitation.

For it must not be forgotten that stock ownership by one company in another is only a mode by which the former company engages in the business of the latter. Whether the stock ownership be large or small, it amounts in effect to a participation in the business for which the second company is formed. But since the second company (if section 51 were unqualified in its effect) might likewise hold stock in any other corporation or corporations, and these might do the same *ad infinitum,* stock ownership in any company under such a system would not evidence a participation in any definite kind of business, but in effect a participation in a "blind pool," subject to the uncontrolled will of the majority. There would be an end at once of all practical force of the doctrine that a certificate of incorporation evidences a contract between the state and the corporation, or between the corporators or stockholders themselves. For an agreement imports an obligation to do some things and to refrain from doing other things. Without defining terms and bounds there can be no agreement.

Thus, if the Atlantic City and Shore Railroad Company, upon becoming incorporated for the avowed purpose of constructing and operating a specified line of railroad, and without regard to whether the purchase of stock in other companies is necessary or convenient to the attainment of the objects set forth in its certificate, has the unlimited power to purchase stock and bonds of any other corporation or corporations of this or any other state, it may purchase not only the stock of a traction company in Atlantic City, but the stock of a mining company in Colorado, or may participate in like manner in any conceivable business or speculation in any part of the civilized

world. Its articles of association would afford no evidence, either to the law officer of the state or to intending purchasers of its shares, as to the actual scope of its activities; nor would any investor have the slightest assurance that the money he intended to embark in a railroad enterprise in Atlantic county, or the earnings of the capital already embarked, would not be diverted into schemes that he had no means of foreseeing.

Again, section 6 of the Corporation act of 1896 (*Pamph. L.* 1896, *p.* 279; amended before incorporation of the Shore company by *Pamph. L.* 1899, *p.* 473), undertakes to prescribe the objects for which corporations may be formed under that act, and these include almost any lawful purpose whatever, *other than* the formation of a savings bank, a building and loan association, an insurance company, a surety company, or a company operating railroads, telephone or telegraph lines within this state.

It has, indeed, been repeatedly held that where the legislature passes separate acts providing for the organization of certain classes of corporations (especially those owing duties and responsibilities to the public) under conditions inconsistent with or different from those prescribed by the General Corporation act, the effect is to impliedly prohibit the organization of corporations of those classes under the latter act, although there be no express prohibition in terms. See *Domestic Telegraph Co.* v. *Newark,* 20 *Vroom* 344, 348; *Richards* v. *Dover,* 32 *Id.* 400, 403; *Montclair Military Academy* v. *Assessors,* 36 *Id.* 516; *Fogg* v. *Ocean City,* 45 *Id.* 362, 366; *Knickerbocker Importation Co.* v. *Board of Assessors, Id.* 583, 590. So far as observed, this doctrine has not heretofore been directly in question in this court, and we do not at present propose to pass upon its soundness, or its precise limitations if sound.

But it is worthy of remark that if section 51 of the act of 1896 has the unlimited scope that a reading of that section alone would indicate, then a company may be organized under that act, and, without expressing any such purpose in its articles of association, may in effect conduct banks and other financial institutions, or operate railroads, telegraph lines.

and other public utilities in this state, by employing the device of acquiring a controlling interest in companies having such activities.

Again, it is undoubtedly the general rule in this country that one corporation may not become a stockholder in another unless authority is clearly granted by statute; and this is but a corollary of the principle that corporations possess only such powers as are specifically granted by the state, and such incidental powers as are necessary for carrying these into effect. *Franklin Company* v. *Lewiston Institution for Savings,* 68 *Me.* 43; 28 *Am. Rep.* 9, and note, *p.* 15; 1 *Thomp. Corp.,* § 1102; 4 *Id.,* § 5719.

To read section 51 of the Corporation act as conferring upon every company, as a primary power, the capacity of holding stock in other corporations, without the mention of such an object among the declared purposes of the company, and without regard to whether such stockholding is necessary or appropriate to the objects that are declared, would result in such an overthrow of these established rules and general principles and of the general statutory policy referred to, and would lead to such confusion and such destruction of proper safeguards, that we are constrained to reject that reading in the absence of language imperatively requiring it.

On the other hand, to treat section 51 (as we do) as designed to express and define one of those powers that are referred to in section 2 of the same act, which may be claimed as a primary power when the purpose to exercise it as such is expressed in the certificate of incorporation, and which otherwise may be claimed only as an incidental power, extending so far as may be necessary or convenient to the objects of the company that are expressed in the certificate of incorporation, renders section 51 consistent not only with section 2, but with the general legislative policy of the state respecting corporations.

It will be observed, therefore, that while the legislature, upon placing the provisions that were in *Pamph. L.* 1893, *p.* 301 (*Gen. Stat., p.* 963, *pl.* 260) into the revised act of 1896,

eliminated the words that confined their operation to corporations created under the act of 1875, they at the same time, as we think, embodied a more practical and useful limitation by the language employed in section 2 of the new act.

We incline to think the view we entertain of the proper scope and operation of section 51 is the same that is held by the legal profession in general. The articles of association of what are known as "holding companies" usually, we believe, are made to express in terms the purpose of holding stocks in other corporations. This is true, at least, of notable examples that have come before this court in litigation.

As already remarked, the incidental powers of railroad companies organized under the act of 1903 (*Pamph. L., p.* 645), is likewise limited by the language of the third section so as to extend only so far as appropriate to and not inconsistent with this act; which means, in effect, not inconsistent with the objects of the railroad company as declared pursuant to the provisions of this act.

The result is that the Atlantic City and Shore Railroad Company has not the power to purchase or hold stock or bonds in any other company except so far as may be appropriate, necessary or convenient to the attainment of the objects set forth in its certificate of incorporation and its route filed under the provisions of the Railroad act, that is to say, the construction, maintenance and operation of a line of railway from a point on the meadows in the township of Egg Harbor to a point at the corner of Virginia and Adriatic avenues in Atlantic City. The fact that the street railway lines of the Central company are beyond those *termini* is sufficient, of itself, to show that a control of its securities is beyond the legitimate functions of the Shore company.

But, besides, the Street Railway Companies act, in its twenty-fourth section (*Gen. Stat., p.* 3219, *pl.* 49), contains this significant prohibition: "That no company not organized under a special charter or under this act, or now actually owning, controlling and operating a street railway, shall hereafter construct or operate any street railway or any branch or

extension thereof in or on any of the streets or highways of any municipality or township of this state." The Shore company is not within either of the classes that are exempted from the prohibition. And it is quite obvious that the company cannot invoke, as an "incidental" power, a stockholding privilege that would enable it to do by indirection that which it is forbidden to do directly.

We, of course, do not mean to intimate that a railroad company organized under *Pamph. L.* 1903, *p.* 645, may, even by expressing such an object in its certificate of incorporation, claim as a primary power the privilege of holding the stock and securities of a company organized under the Street Railway Companies act. *Pamph. L.* 1886, *p.* 185; *Gen. Stat., p.* 3216. Aside from the prohibition in section 24 of the latter act, the franchises to be acquired under the one statute are materially different from those to be acquired under the other, and the mode and conditions of their acquisition and exercise are different.

Nor, on the other hand, do we intend to intimate that under no circumstances may a railroad company acquire stock in another corporation. Circumstances might occur where the exercise of such a power would be properly incidental to the legitimate objects of the railroad company. Without stopping to speculate upon such cases, we confine the present decision to the case as presented.

The ownership of stock and bonds of the Central company by the Shore company, as admitted upon this record, is, in our opinion, a clear usurpation of franchises by the latter company.

The remaining questions are the right of the Shore company to operate its cars and motive power over the lines of the street railway company, and its right to enter into an agreement with the latter company such as has been made.

As already observed, the Shore company by its plea denies that it is operating its cars over the lines of the Central company. And the agreement shows that in form the Central company is to operate the cars as soon as they reach its tracks.

But the question of usurpation of franchises is a question of substance, not of form. And since the pleadings show the Shore company to be in complete control of the Central company by virtue of the stock ownership, and show at the same time that the agreement in question was made pending that control, it results that the stock ownership and the agreement form but the devices by which the Shore company in fact and in truth operates and proposes to operate not only its cars but the cars of the Central company over the street railway lines. The denial in the plea that the Shore company operates the Central's lines is a denial only *sub modo,* to be taken subject to the qualifications resulting from other facts that stand admitted upon the record. The ownership of all the bonds and of substantially all the stock of the Central company by the Shore company necessarily and obviously result in a practical absorption and merger of the former company into the latter. The effect of this is not substantially modified by the device of leaving a few so-called "qualifying shares" outstanding in the names of individuals. By the absorption the Central company has become *de facto* a mere part of the Shore company, and the stockholders of the latter are *de facto* proprietors of the assets and franchises of the former. The operation of the street railway lines is *de facto* but one of the activities of the Shore company; and the agreement ostensibly made between the two companies is in effect made by the Shore company with itself.

Therefore, since we have found that as matter of law the ownership of the stock and bonds of the Central company constitutes an usurpation by the Shore company of franchises not granted to it by the state, it results that the exercise by the Shore company of the control that results from such ownership, including the operation of its cars over the Central lines and the agreement that has been made for the continuance of such operation, likewise constitute an usurpation of franchises by the Shore company.

This result renders it unnecessary to consider the question that was discussed upon the argument, whether, upon the

assumption that the two companies were in law and in fact independent of each other, it would be contrary to public policy, as manifested in our legislation, for the Shore company to enter into and carry out such a traffic agreement.

Upon this topic, therefore, we express no opinion.

Having found that the Shore company is unlawfully usurping franchises in the three respects indicated, the sole remaining question is, what judgment should be rendered against it. The suggestion of the information is that its articles of incorporation should be set aside, annulled and forfeited. We hardly think the facts of the case require so drastic a remedy. The information does not bring in issue any abuse of the franchises that were lawfully acquired by the Shore company. Laying aside certain prefatory averments concerning the agreement made between that company and the West Jersey and Seashore Railroad Company (of which no specific complaint is made), the charge is confined to the usurpation of franchises not granted. In the absence of *mala fides* or a stubborn persistence in the usurpation, there would seem to be no reasonable ground for declaring the corporate existence and legitimate franchises of the company to be forfeited. A judgment ousting the company from the franchises that it has unlawfully usurped in acquiring and holding the stock and bonds of the Central company, in thereby controlling that company, and through it operating the street railway lines, and in making the traffic agreement that is the subject of complaint, together with the imposition of a nominal fine, would seem to fulfill the reasonable requirements of the case; at least, if the Shore company will promptly and in good faith rid itself of the stock and bonds, and undo whatever else has been done in the way of usurpation.

In *People* v. *Rensselaer and Saratoga Railroad Co.,* 15 *Wend.* 113; 30 *Am. Dec.* 33, Chief Justice Savage (15 *Wend.* at *p.* 128), declared the English rule to be, that when a liberty is wrongfully usurped and upon no title, a judgment of ouster shall be entered. But when it appears that a liberty has been granted but has been misused, judgment of seizure into the

king's hand shall be given; the reason being that that which came from the king is returned there by seizure, but that which never came from him but was usurped shall be declared null and void; that judgment of ouster is rendered against individuals for unlawfully assuming to be a corporation, and is rendered against corporations for exercising a franchise not authorized by their charter, in which case the corporation is ousted of the franchise, but not of being a corporation; while judgment of seizure is given against a corporation for a forfeiture of its corporate privileges. And in the earlier case of *People* v. *Utica Insurance Co.,* 15 *Johns.* 358, which was a *quo warranto* against the company for carrying on banking operations without authority from the legislature, the court awarded judgment ousting the defendant from the liberty of carrying on the unauthorized business.

But since the form of the judgment was not discussed in the argument, we prefer to hear counsel before finally passing upon it.

Let the judgment of the Supreme Court be reversed, and counsel be heard upon the form of the judgment that should be entered in the place thereof.

*For affirmance*—MINTURN, GRAY, DILL, J.J.   3.

*For reversal*—THE CHANCELLOR, GARRISON, SWAYZE, REED, TRENCHARD, PARKER, VOORHEES, BOGERT, VREDENBURGH, J.J.   9.